UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KEVIN POUND, on Behalf of Himself and All Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>STEREOTAXIS, INC., MICHAEL P. KAMINSKI, and DANIEL J. JOHNSTON,<br><br>      Defendants. | )<br>)<br>)<br>) Case No. 4:11CV1752 HEA<br>)    CLASS ACTION<br>)<br>)<br>)<br>)<br>)<br>) |

# **OPINION, MEMORANDUM AND ORDER**

This matter has now come before the court on Defendants' Motion to Dismiss Plaintiff's First Consolidated Amended Class Action Complaint. [Doc. #31]. Plaintiff has filed a response in opposition to the motion. [Doc. #48]. Defendants has filed a reply. [Doc. #49]. The parties have also had the opportunity to supplement their authorities in their memoranda. For the reasons set forth herein the Motion to Dismiss will be granted.

## **Factual Background[1]**

Plaintiff has filed his complaint against Stereotaxis, its Chief Executive Officer ("CEO"), Michael P. Kaminski ("Kaminski") and its former Chief

---

[1] The factual circumstances are taken from the pleadings and other attachments to the pleadings. The facts and inferences from these documents are taken solely for the purpose of the resolution of the motion and for no other purposes in this piece of litigation. This recitation in no way relieves any party of the necessary proof of any fact in later proceedings.

Financial Officer ("CFO"), Daniel J. Johnston ("Johnston") (collectively, "Defendants"), for violations of sections 10(b) and 20(a) of the Exchange Act, and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 during the alleged class period between February 28, 2011 and August 8, 2011.

Stereotaxis designs, manufactures, and markets robotic devices for use in complex cardiac interventions to treat arrhythmias and other coronary artery disease. Stereotaxis's flagship product has been its Niobe system. This system allows doctors to navigate a catheter (or other device) through blood vessels and into the chambers of the heart using computer-controlled externally applied magnetic fields. Because these products require dedicated rooms, the sales cycle for Stereotaxis products can be lengthy and subject to contingencies outside of Stereotaxis's control. Additionally, Stereotaxis developed the Odyssey Enterprise Solution, which consolidates all laboratory information into one source for optimum efficiency. Finally, Stereotaxis receives revenue from the sale of proprietary disposable devices, ongoing license and service contracts, and catheters.

Plaintiff has alleged further that defendants misled investors by claiming the Niobe system made substantial progress towards "setting a new standard of care" for interventional cardiology instruments, and had gained broad acceptance in the medical community that would support a "predictable ramp to [Niobe System]

usage and clinical adoption" in the "robust market" for robotic cardiac ablation solutions. Defendants told investors that the Niobe System had entered a new phase of accelerating clinical adoption, evidenced by the "strength in global new capital orders" and increasing "backlog," which they claimed consisted of "outstanding purchase orders and other commitments that management believes will result in recognition of revenue upon delivery or installation of [the] systems." Defendants touted "$43 million of backlog, consisting of outstanding purchase orders and other commitments for these systems" as of December 31, 2010. Defendants repeatedly acknowledged that investors considered the Niobe System backlog a "significant indicator of future performance" for the Company. They assert that by the same token Defendants knew that the Niobe System would never achieve broad clinical adoption because most customers were demanding "fundamental product improvements."

Plaintiff alleges that Defendants knew or recklessly disregarded the softening backlog would be accelerated by the strategy to address the fundamental problem of the Niobe System.

**Stereotaxis's February 2011 Statements.** On February 28, 2011, Stereotaxis issued a press release announcing year-end and fourth-quarter 2010 financial results. That release was followed by a same-day conference call with investors. On March 11, 2011, Stereotaxis filed its Form 10-K. Although Niobe-

based revenue in 2010 was lower than expected, Stereotaxis experienced an increase in orders and completed sales, and decreased expenses. Looking forward, Stereotaxis provided the following guidance for 2011:

- New capital order growth expected to be in the mid-30% range
- Total revenue growth expected to be in the 20%-30% range
- Gross margins expected to be in the high-60% range
- Operating expenses expected to be in the $62-$63 million range

In addition, Stereotaxis noted (1) its progress toward widespread clinical adoption of the Niobe system, and (2) its "backlog" of "outstanding purchase orders and other commitments that management believes will result in recognition of revenue."

At the same time, Stereotaxis advised investors that these statements were "forward-looking," and "inherently involve risks and uncertainties" that "could cause actual results to differ materially" – such as the "ability and willingness of customers to purchase our systems and the timing of such purchases." With respect to its "backlog," the Company advised that "these purchase orders and other commitments are subject to contingencies that are outside of the Company's control . . . and . . . may be revised, modified, delayed or canceled . . ." and warned that "[t]here can be no assurance that the Company will recognize revenue related to its purchase orders and other commitments in any particular period or at all. . . ." In addition, each of these statements specifically referenced the Company's extensive, 17-page disclosure of "Risk Factors" in Item 1A of its 10-K, including:

> - Hospital decision-makers may not purchase our Niobe . . . system. . .
> - Physicians may not use our products . . .
> - [W]e may not be able to achieve future sales growth.

The Company reiterated that "negative changes to this backlog . . . could negatively impact our future operating results or our share price." *Id*. at 24.

**Stereotaxis's April Announcement of the New Epoch Solution.** In late 2010, Stereotaxis began developing an upgrade called Niobe ES, which was incorporated into a suite of products called the Epoch Solution. This upgrade was designed to improve the Niobe system in precisely those areas that the Amended Complaint alleges were shortcomings, including shorter training times, better ease of use, and a shorter physician learning curve. In a press release issued April 27, 2011, the Company announced that its Epoch Solution, including the Niobe ES, would be unveiled at the annual Heart Rhythm Society meeting on May 5-7, 2011 in San Francisco.

**Stereotaxis's May 2011 Statements.** When announcing its first quarter 2011 results in May, 2011, the Company noted that results were down slightly from expectations. Stereotaxis specifically noted the difficult market conditions and uncertainty regarding the market's acceptance of Epoch: "[w]ith the Epoch transition and the soft order pattern in Q1, achieving our outlook for new capital orders and revenue growth will largely depend on the market acceptance of Epoch."

**Stereotaxis's August 2011 Statements.** On August 8, 2011, the Company announced its financial results for the second quarter of 2011. Those results were disappointing. As compared to the second quarter of the prior year, revenue was down, gross margin was down, and the Company posted a higher net loss. As for its financial outlook, the Company said:

> As a result of corporate developments and an uncertain business environment, Stereotaxis announced that it has withdrawn previous financial guidance [for 2011] and temporarily suspended providing financial guidance for 2011 until there is more predictability to the Company's magnetic platform business.

## Discussion

Pleading Standard

Section 10(b) of the Exchange Act and SEC Rule 10b-5 "prohibit[] fraudulent conduct in connection with the sale or purchase of securities." *Kushner v. Beverly Enterprises,* 317 F.3d 820, 826 (8th Cir. 2003). To state a claim, a plaintiff must allege that a defendant made a misleading statement or omission of material fact, with scienter, on which plaintiff relied, and which caused plaintiff's losses. *See In re K-Tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 888 (8th Cir. 2002). Under the Private Securities Litigation Reform Act of 1995 (the Reform Act), 15 U.S.C. § 78u-4(b)(1) and (2) the pleading requirements necessary to state a claim for private securities fraud are set forth. The appropriate pleaded elements are thus: (1) a material misrepresentation of fact; (2) scienter; (3) a connection with the

purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.,* 641 F. 3d. 1023, 1028 (8th Cir. 2011). The prosecution of claims under Section 10(b) must comply with Federal Rule of Civil Procedure 9(b) and the PSLRA.

Although the Court must view the factual allegations in the light most favorable to plaintiffs, *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997), the Reform Act dictates a modified analysis due to its special heightened pleading Rules, such that the Court must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the [Reform Act]," *[Florida State Bd. of Admin v. ] Green Tree* 270 F.3d [645,] 660 [(8th Cir. 2001)]." *Kushner v. Beverly Enterprises,* 317 F.3d 820, 824 (8th Cir. 2003). "Complaints brought under Rule 10b-5 and section 10(b) are governed by special pleading standards adopted by Congress in the [Reform Act]. These pleading standards are unique to securities and were adopted in an attempt to curb abuses of securities fraud litigation." *In re Navarro Corp. Sec. Litig.*, 299 F.3d 735, 741 (8th Cir. 2002).

> Congress enacted two heightened pleading requirements in the Reform Act. First, the Reform Act requires the plaintiff's complaint to specify each misleading statement or omission and specify why the statement or omission was misleading. 15 U.S.C. § 78u-4(b)(1) (Supp. IV 1998). If the allegation "is made on information and belief, the complaint shall state with particularity all facts on which that

belief is formed." *Id.* Similarly, Rule 9(b) of the Federal Rules of Civil Procedure had long required that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. The text of the Reform Act was designed "to embody in the Act itself at least the standards of Rule 9(b)." *Greebel v. FPT Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999).

Second, Congress stated in the Reform Act that a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Green Tree*, 270 F.3d at 654. The Reform Act requires the court to dismiss the complaint if these requirements are not met. 15 U.S.C. § 78u-4(b)(3). "[U]nder the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind." *Green Tree*, 270 F.3d at 660.

> "Congress has effectively mandated a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule(12)(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences."

*Id.* (quoting *Greebel,* 194 F.3d at 195-96) (alterations in original).

*Kushner*, 317 F.3d at 826.

Defendants argue that under these standards, plaintiff cannot maintain his action. Defendants claim the statements are protected under the "Safe harbor" provision of the Reform Act; that the plaintiff has failed to establish the falsity of the allegations and that plaintiff has failed to plead specific facts giving rise to a strong inference of scienter.

Defendants assert the alleged misstatements set forth by plaintiff are all forward-looking. The Defendants further assert that while not all of the statements may be forward-looking, none of the statements rise sufficiently to the level of material misrepresentations to raise, or satisfy, a claim under the Securities Act.

The PSLRA provides insulation from liability regarding "forward looking" statements. These are statements "containing a projection of revenues, income, … or other financial items," "plans and objectives of management for future operations" and "future economic performance," as well as any "assumptions underlying or relating to any" such statements. *See* 15 U.S.C. § 78u-5(i)(1). A claim based upon such statements must show not only that the projection failed to materialize, but that Defendants failed to adequately caution the market about the risks inherent in achieving such projections, and that the statements were made with "actual knowledge" of their falsity. *See, e.g. In re Patterson Cos.*, 479 F. Supp. 2d 1014, 1035 (D. Minn. 2007) ("[F]orward-looking statements cannot form the basis for liability under the Exchange Act if accompanied by meaningful risk disclosures or if not made with actual knowledge of falsity.").

Forward Looking Statements

Here, Plaintiff has raised a challenge to certain types of statements issued by Defendants. Those statements include guidance statements, progress statements relating to clinical adoption of the Niobe system and statements relating to

backlog. These statements of financial guidance and projections of future performance are "quintessential forward-looking statements." *See W. Wash. Laborers-Employers Pension Trust v. Panera Bread Co.*, 697 F. Supp. 2d 1081, 1093 (E.D. Mo. 2010). The statements about progress toward meeting the Company's goals relating to clinical adoption of the Niobe system are likewise forward-looking, because "statement[s] about the state of a company whose truth or falsity is discernible only after it is made necessarily refer[] only to future performance." *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999); *W. Wash. Laborers-Employers Pension Trust*, 697 F. Supp. 2d at 1093. "Regardless of the tense of the statement [a] statement concerning ongoing progress is forward-looking because it does not make any specific, verifiable representation about the present state of affairs." *W. Wash. Laborers-Employers Pension Trust*, 697 F. Supp. 2d at 1094 (finding "the consolidation continues as planned" and "2006 is shaping up to be another strong year" both to be forward-looking). Statements regarding "backlog" are forward-looking as well, where "backlog" is defined as outstanding orders and commitments that management "**believes will result** in recognition of revenue." Only time can tell whether the orders and commitments included in "backlog" would ever result in revenue. It is therefore axiomatic that the company statements relating to backlog is forward-looking.

Cautionary Language

The safe harbor provision is satisfied where cautionary language is not mere boilerplate but "company-specific warnings." *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 872 (D. Minn. 2007). The "cautionary statements must warn of risks of a significance similar to that actually realized." *W. Wash. Laborers-Employers Pension Trust*, 697 F. Supp. 2d at 1090. With reference to the 2011 financial outlook of the company, Stereotaxis issued warnings of risks and uncertainties that could cause actual results to differ materially, listed manifold specific risks, and incorporated by reference the risk disclosures set forth in the Company's SEC filings. As to its progress in meeting the Company's goals for clinical acceptance of the Niobe system, Stereotaxis warned that hospital decision-makers may not purchase their Niobe … system, physicians may not use their products, and market acceptance could be delayed by lack of physician willingness to attend training sessions, or by the time required to complete this training. As to the backlog, Stereotaxis warned that orders could be revised, modified, delayed or canceled and that negative changes to this backlog or its failure to grow commensurate with expectations could negatively impact its future operating results or its share price. This cautionary language was "substantive and tailored to the specific future projections, estimates, or opinions . . . which the plaintiff[ ] challenge[s]." *See In re Daktronics, Inc. Sec. Litig.*, No. CIV 08-4176, 2010 WL 2332730, at *16 (D.S.D. June 9, 2010) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 559 (6th Cir. 2001)).

All of these statements as challenged are forward-looking and therefore fall within the calm waters of the safe harbor.

**Actual Knowledge of Falsity**

In addition, the pleading requirements of particularity relating to the falsity of statements allegedly made leaves Plaintiff's assertions severely wanting. He has merely pleaded, as to each alleged false statement, that Defendants "knew and failed to disclose." There are no particular facts alleging the statements to be false when made or that the Defendants had actual knowledge of the falsity of the statements. Catch all or blanket assertions that do not survive the expectations of the particularity requirements must be disregarded. ("Rote allegations that the defendants knowingly made false statements of material fact alone are insufficient."). *In re Navarre Corp. Sec. Litig.*, 295 F. 3d 791.

Plaintiff alleges and argues that statements made by Defendants regarding growth projections were false. Plaintiff would also have this Court believe by way of inference that the discontinued guidance information three months after reaffirming defendants' financial guidance and claims of a predictable ramp to broad clinical acceptance for the Niobe System establishes the fraudulent shroud over the statements. Plaintiff has not made any allegations establishing that the guidance information lacked a reasonable basis or was made in bad faith. Forward –looking statements are protected from liability unless the statement was made or

reaffirmed without any reasonable basis or was not disclosed in good faith. *In re NationsMart Corp. Sec. Litig.,* 130 F. 3d 309, 316 (8th Cir. 1997).

**Backlog/clinical Acceptance and Confidential Witness Statements**

Plaintiff provides statements/affidavits of a number of "confidential witnesses" to demonstrate the backlog reporting was misleading. Three of these witnesses – CW1, CW2 and CW4 – state that certain customers expressed dissatisfaction with the Niobe product, which Plaintiff relies on to suggest that the Niobe system was not being clinically adopted. CW2 and CW3 also state that they believed in their opinion the Company's reported backlog reports were misleading. The Eighth Circuit has made clear that confidential witness allegations will be disregarded as unreliable where a plaintiff "fail[s] to provide any information regarding how employees at this level of the company would have access to the [ ] information" alleged (*Cornelia*, 519 F.3d at 783); relies on witnesses whose information comes only second or third-hand (*Horizon Asset Mgmt. v. H&R Block, Inc.,* 580 F.3d 755, 763 (8th Cir. 2009)); or fails to establish that the witnesses "would have a basis to know what [defendants] knew." *Id.*

There is no allegation that the confidential witnesses were in a position to testify reliably about any relevant fact. Two of them – CW3 and CW4 – were not even employed by Stereotaxis during the Class Period, having terminated their employment 8 months and 1 year, respectively, prior to its commencement. They

cannot therefore have relevant information about facts as they existed during the Class Period. *See Horizon Asset Mgmt.*, 580 F.3d at 763. These witnesses do not have a position within Stereotaxis that would provide them with any relevant insight. *Id.* Specifically, CW1, CW2 and CW3 are alleged to have operated three reporting levels below the Defendants, and none is alleged to have had anything other than anecdotal information regarding individual customer complaints. There is no allegation that any of the CWs were involved in preparing projections, analyzing trends, or financial reporting. These statements fail to support Plaintiff's claims. *See Cornelia*, 519 F.3d at 783 (rejecting witness statement that "fail[ed] to provide any information regarding how employees at this level of the company would have access to the [ ] information.").

Plaintiff provides no allegation of how any of the witnesses was in position to testify concerning what "Defendants knew," or what was "well understood" or "widely understood." This lack of specificity fails to satisfy Rule 9(b) and the pleading requirements of the PSLRA. *See, e.g. Cal. Pub. Emples. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 153 (3d Cir. 2004) ("Incredulously, without providing any further description, Plaintiffs attribute to these same former employees the bald assertion that 'this conduct occurred throughout the Company.'"); *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) ("Plaintiffs fail to allege who at [the Company] knew about these alleged [ ] improprieties and what, when, where,

and how they knew."). There are no contemporaneous facts showing that defendants' statements were false when made. The sole information provided by Plaintiff is anecdotal information from low-level employees which fails the test of particularity. *See In re Hutchinson Tech., Inc., Secs. Litig.*, 536 F.3d 952 (8th Cir. 2008).

**Omission of Material Fact**

Are there any pearls of allegation that might give boost to the position of Plaintiff? What about omissions of material fact that might inflate the statements to the level of misleading? Suffice to say that it is "an insuperable bar to relief when alleged omissions are immaterial." *In re Medtronic Inc. Sec. Litig.,* 618 F. Supp. 2d 1016, 1023 (D. Minn. 2009) (quoting *In re Amdocs Ltd. Sec. Litig.,* 390 F.3d 542, 547 (8th Cir. 2004). An omitted fact is immaterial unless there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). The court has finely combed through the pleadings and documents, and, alas Plaintiff has not identified any omitted fact that would have significantly altered the terrain of information available to investors.

Plaintiff has claimed the Company touted "progress toward our goal" of establishing Niobe as a new standard of care and "progress in our key initiatives of

driving stronger Niobe reference sites," but omitted to disclose that doctors were "abandoning the Niobe System before becoming clinically proficient" due to shortcomings in the technology. Defendants, however, clearly disclosed that the Company faced a "challenge" with then-current adoption rates for the Niobe system noting in one instance by way of example, adoption at only "4% of the market share." Even in those hospitals with an installed Niobe System, the Company explained that the system was used for only 15-23% of the procedures performed in those hospitals.  Plaintiff's anecdotal evidence of "stalled accounts" provide anything to the milieu of information available to investors, who had already been warned of these issues and challenges facing the Company. *See In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d at 1034 (Dismissing complaint for failing to explain how "the accumulation of additional anecdotal data … would have added anything to the disclosures already made").

Plaintiff alleges that Defendants cited to the Company's "backlog" while omitting to disclose that the orders included in backlog "carried no obligation to actually complete the purchase of a Niobe System." The record however belies this assertion. Defendants disclosed exactly how they defined "backlog," as consisting of outstanding purchase orders and commitments. The Company even noted that the commitments may be revised, modified or canceled and that there could be no assurances that the company will recognize revenue related to its purchase orders

and other commitments in any particular period or at all. Plaintiff has failed to demonstrate any material omissions in these regards.

**A Strong Inference Of Scienter**

A Plaintiff must plead particularized facts giving rise to a strong inference that Defendants acted with knowledge or "reckless disregard of a substantial risk" that the statement was false with regard to each act or omission alleged to violate the PLSRA. *See Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, No. 08-CV-1411, 2010 WL 889864, at*2 (E.D. Mo. Mar. 8, 2010). "[S]trong means strong." *In re Ceridian Corp. Secs. Litig.*, 504 F. Supp. 2d 603, 615 (D. Minn. 2007). "Negligence – even gross or inexcusable negligence – is not sufficient to meet this standard." *Id.* Recklessness requires a showing of:

> highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 616.

Here, Plaintiff alleges that the corporate officers had a desire to keep the Company profitable and hoped to conceal the truth because they knew the Company was in desperate need of capital. This is the only motive alleged by Plaintiff. In order to show motive and opportunity sufficient to establish scienter, "the allegations must show that the particular defendant benefitted in some

concrete and personal way from the alleged fraud, such as through insider trading. Even allegations of insider trading are insufficient unless the trades are unusual …" *In re Hutchinson Technology, Inc.*, 502 F. Supp. 2d 884, 898 (D. Minn. 2007). Motive-and-opportunity allegations must go beyond alleging a general desire to increase stock prices . . . because that desire is universal among corporate insiders. *Id.* The pleadings are devoid of any facts giving rise to a strong inference that any of the Defendants stood to benefit in a "concrete and personal way" from the alleged fraud.

Plaintiff having failed to demonstrate any motive or opportunity the court must now consider whether any other allegations which might tend to show scienter are particularly strong. *Fla. State Bd. of Admin.*, 270 F.3d at 660. Claims such as made here by Plaintiff have been rejected. The claim of individual Defendants having the requisite scienter because their corporate positions afforded them access to a wide range of information is insufficient. *See In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d at 1034 ("allegation of data monitoring, "access to data," and "general allegations about a hands-on management style" are insufficient). Defendants were close to and directly involved in the Company's operations, sales, and financial reporting; defendants had access to order, sales, and backlog data al all non-particularized allegations of scienter and therefore insufficient. *See Elam v. Neidorff*, 502 F. Supp. 2d 988, 990 (E.D. Mo. 2007).

The use of the confidential witnesses by Plaintiff is likewise dubious on the issue of setting forth a strong inference of scienter. None of the witnesses claims to have had any direct contact with the Defendants, or provides first-hand testimony of communications with them concerning the matters alleged. Such conclusory and third-hand allegations are insufficient to show scienter. *See Horizon Asset Mgmt.*, 580 F.3d at 763 (rejecting witness who was relying on second-hand reports). Additionally, none of the confidential witnesses is alleged to have been in position to know what the Defendants knew. CWs 1-3 were each employed three reporting levels below Defendants and Plaintiff presents no facts describing CW4's role in the Company.

**THE CLAIM IN COUNT II**

In order to state a claim under Section 20(a) of the Act, a Plaintiff must adequately plead a primary violation of securities laws. *See In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 904 n.20 (8th Cir. 2002). Stating a claim for control person liability requires a showing of "actually participated in" and "possessed the power to control" the activity which is the foundation for the primary violation. *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985). Simply being in the position of an officer or director does not necessarily make one a control person. *Jakobe v. Rawlings Sporting Goods Co.*, 943 F. Supp. 1143, 1163 (E.D. Mo. 1996). In the matter here, Plaintiff simply alleges the corporate positions of the defendants

without more. No facts are alleged to sufficiently establish control person liability under the heightened pleading requirements.

**Conclusion**

Based upon the foregoing analysis, Plaintiff has failed to sufficiently plead a cause of action under the Securities Act, in light of the heightened pleading requirements and the safe harbor provisions of the Reform Act. The Complaint fails to state a cause of action against the individual Defendants as well the Company. The claims against the individual Defendants and Stereotaxis cannot prevail.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Plaintiff's First Consolidated Amended Class Action Complaint [#31], is granted and this matter is dismissed.

Dated this 18th day of March, 2014.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE